## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UMB BANK, N.A.,<br><br>              *Plaintiff*,<br><br>     v.<br><br>JESSIE BENTON,<br>ANTHONY GUDE,<br>DARIA LYMAN, AND<br>CYBELE BENTON MCCORMICK,<br><br>              *Defendants*. | Case No. _____ |

## COMPLAINT FOR DECLARATORY JUDGMENT

For its Complaint, Plaintiff UMB Bank, N.A. ("UMB") hereby states and alleges as follows:

## PRELIMINARY STATEMENT

This is a complaint for declaratory judgment. The Defendants in this action have sued UMB in state probate court seeking exorbitant damages. The vast majority of the damages sought in that pending state-court action are due to UMB's alleged failure, as Trustee for the trust of the late artist Thomas Hart Benton and his wife Rita Benton, to license and enforce the copyrights on Mr. Benton's artwork, and to exercise the exclusive right to reproduce those works granted to the holder of those copyrights. But all of these pending damages claims presuppose, and require Defendants in this action to prove, that the Benton Trusts held valid, enforceable copyrights to each of Mr. Benton's artistic works when UMB managed the Benton Trusts. While Defendants in this action maintain that they are owed damages in state court for UMB's failure to monetize these copyrights, UMB contends that, under the proper application of the federal Copyright Act, the copyright for many of Mr. Benton's works was either dedicated to the public or held by a third

1

party, such that UMB cannot be liable for such damages. UMB also contends that all of these pending damages claims, except for those pertaining to alleged action or inaction by UMB occurring after December 14, 2016, are barred by a proper application of the Copyright Act's three-year lookback for damages. As such, a concrete dispute exists that cannot be resolved without substantial interpretation and application of the federal Copyright Act. In this action, UMB seeks a declaration that:

1) The Benton Trusts, while UMB served as Trustee, could not have owned copyrights in certain artworks created by the artist Thomas Hart Benton ("THB") because those works passed into the public domain prior to THB's death. UMB as Trustee therefore did not have the right to license or enforce copyrights in those works, and did not have exclusive rights to reproduce and sell copies of those works. This judgment applies to:

   a. The works listed at paragraphs 45-59 of this Complaint, which passed into the public domain upon publication due to failure of any non-UMB copyright holder to comply with copyright notice requirements;

   b. All works published prior to 1964 in which THB held copyright, as those works passed into the public domain upon expiration of their first 28-year copyright term because THB himself, or his statutory successors in copyright renewal rights under the 1909 Copyright Act and 17 U.S.C. § 304, failed to properly renew copyrights in those works;

   c. Other works to be uncovered during discovery and proven at trial.

2) The Benton Trusts, while UMB served as Trustee, never had copyright renewal rights in certain THB works because those renewal rights vested by statute in THB's living children, including THB's daughter Jessie Benton, a named Defendant in this case, and THB's son T.P. Benton during his lifetime. UMB as Trustee therefore could not have renewed those copyrights following expiration of their original copyright term for purposes of licensing or enforcement, or for retaining exclusive reproduction and sale rights in the works themselves. This judgment applies to all THB works published between 1964 and THB's death on January 19, 1975 in which THB held a valid copyright at the time of his death.

3) The Benton Trusts, while UMB served as Trustee, never owned copyrights in certain THB works because THB assigned those copyrights to non-UMB third parties prior to his death. UMB as Trustee therefore never had rights

2

to license or enforce copyrights in those works, or otherwise reproduce and sell copies of those works. This judgment applies to the works described at paragraphs 101-103 of this Complaint, and to other works to be uncovered during discovery and proven at trial.

4) The Benton Trusts, while UMB served as Trustee, never owned copyrights in certain THB works because they were commissioned works and, under the "works made for hire" doctrine, any copyrights in them therefore belonged to the non-Trust, non-UMB third parties who commissioned them or otherwise hired Thomas Hart Benton to create them. UMB as Trustee therefore never had rights to license or enforce copyrights in those works, or otherwise reproduce and sell copies of those works. This judgment applies to the works listed at paragraphs 117-119 of this Complaint, and to other works to be uncovered during discovery and proven at trial.

5) Defendants are barred under 17 U.S.C. § 507(b) from recovering damages based on any alleged failures by UMB, as Trustee of the Benton Trusts, to license, enforce, or to exercise exclusive rights in reproduction and sales of copyrighted works, occurring prior to December 14, 2016. This judgment specifically applies to the damages sought by Defendants in the case captioned *Jessie Benton, et al v. UMB Bank N.A.*, Case No.: 19P8-PR01534 (Circuit Court of Jackson County, Probate Division), and to any subsequent claim for damages in that case that or any other case brought by Defendants that arises under the Copyright Act.

6) The Benton Trusts, while UMB served as Trustee, did not own any valid and enforceable copyrights in any THB work.

## PARTIES

1. Plaintiff UMB is located in Kansas City, Missouri, with its corporate headquarters and principle place of business at 1010 Grand Boulevard, Kansas City, Missouri.

2. Defendant Jessie Benton is an individual presently residing in Chilmark, Massachusetts.

3. Defendant Anthony Gude is an individual presently residing in Frankfort, Kansas.

4. Defendant Daria Lyman is an individual presently residing in Cambridge, Massachusetts.

5. Defendant Cybele Benton McCormick is an individual presently residing in Vineyard Haven, Massachusetts.

3

## JURISDICTION & VENUE

6.     UMB brings this suit for a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202. A controversy currently exists between UMB and Defendants respecting the ownership and existence of certain copyrights, and requiring the interpretation of certain copyright laws arising under Title 17, United States Code. Resolution of these copyright issues is necessary to the determination of certain state law counts brought by Defendants against UMB in Missouri state court.

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1338(a), as UMB's claims arise under the laws of the United States, namely the Copyright Act (Title 17 of the United States Code) and Declaratory Judgment Act (28 U.S.C. § 2201).

8.     This Court has personal jurisdiction over Defendants because Defendants initiated an action in the Circuit Court of Jackson County, Missouri, Probate Division against UMB in December 2019, out of which many of the facts and events described in this Complaint arise. By bringing an action in Missouri state court, Defendants have purposefully availed themselves of the benefits and protections of the State of Missouri and could reasonably foresee being haled into federal court in Missouri to resolve issues arising in their state court action.

9.     Venue is proper in this district under 28 U.S.C. § 1400(a) because all Defendants "may be found" in this district. Defendants "may be found" in a particular judicial district under 28 U.S.C. § 1400(a) if they would be subject to personal jurisdiction in that district. As noted *supra* at ¶ 8, Defendants are subject to personal jurisdiction in the State of Missouri. Further, Defendants' contacts with the State of Missouri are specific to this district, as Defendants filed their state court action in Jackson County Probate Court, which falls within the physical boundaries of the Western

District of Missouri. Because Defendants' contacts with the State of Missouri subject them to personal jurisdiction in this judicial district, Defendants "may be found" in this district and venue is therefore proper here.

## FACTUAL ALLEGATIONS

### I. General Background

10.     Thomas Hart Benton ("THB") was born on April 15, 1889, in Neosho, Missouri.

11.     THB created thousands of works of art, including paintings, murals, drawings, and lithographs.

12.     THB married Rita (Piacenza) Benton in 1922.

13.     THB and Rita had two children, Thomas "T.P." Benton (born in 1926) and Jessie Benton (born in 1939).

14.     THB died on January 19, 1975, in Kansas City, Missouri.

15.     Rita Benton died on April 9, 1975, in Kansas City, Missouri.

16.     THB and Rita Benton executed wills and testamentary trusts during their lifetimes providing for the administration of their estates.

17.     THB's Last Will and Testamentary Trust, including two codicils, was admitted in the Probate Court of Jackson County on June 11, 1975.

18.     Rita Benton's Last Will and Testamentary Trust, including one codicil, was admitted in the Probate Court of Jackson County on June 11, 1975.

19.     UMB was designated as Co-Executor and Co-Trustee of the Thomas Hart Benton testamentary trust and the Rita P. Benton testamentary trust ("the Benton Trusts"), along with Benton family friend and attorney Lyman Field.

20.     Final settlement of THB's estate and transfer of property to Co-Trustees UMB and

5

Field occurred on May 31, 1979.

21. Final settlement of Rita Benton's estate and transfer of property to Co-Trustees UMB and Field occurred on June 22, 1979.

22. UMB served as the Trustee of the Benton Trusts starting May 31, 1979 and June 22, 1979 and continuing until UMB's resignation as Trustee on March 31, 2021.

23. The Benton Trusts include, among many different bequests, instructions concerning the management of several thousand works of art by THB.

24. Upon the death of Rita Benton, T.P. Benton and Jessie Benton became the primary beneficiaries of the Benton Trusts.

25. T.P. Benton died in February 2010 at his home in Massachusetts.

26. Jessie Benton is now the primary beneficiary of the Benton Trusts.

27. The Benton Trusts further provide that, upon Jessie Benton's death, the Trustee shall make disposition among Defendants Anthony Gude, Daria Lyman, and Cybele Benton McCormick in accordance with the provisions of the Benton Trusts.

## II.  Overview of Prior Proceedings Between the Parties Leading to this Action

28. Defendants originally filed suit against UMB on December 17, 2019, in the Circuit Court of Jackson County, Missouri, Probate Division (Case No. 19P8-PR01534) ("the State Court Action"), alleging breach of trust, self-dealing, and violations of the Prudent Man Rule and Prudent Investor Act, and requesting removal of UMB as trustee of the Benton Trusts. A copy of Defendants' state court petition is attached as Ex. A.

29. While Defendants' state court petition included high-level allegations of failures to maximize revenue through promoting, licensing, and copyrighting "Benton artwork," it did not on its face raise any issues that would necessarily require interpretation or application of the U.S.

6

Copyright Act, nor did it identify any specific THB artworks or categories of artworks for which UMB, as Trustee of the Benton Trusts, allegedly mishandled copyrights, or any details as to how copyrights were allegedly mismanaged.

30.     Discovery proceeded in a similar manner, with the parties' document requests, interrogatories, and deposition topics focused on UMB's alleged mismanagement of Trust assets without raising any issues requiring application or interpretation of federal law.

31.     Then, in June 2021, Defendants—as plaintiffs in the State Court Action—revealed that nearly their entire damages ask was based on allegations that UMB, as Trustee of the Benton Trusts, failed to license copyrighted THB artworks and failed to exercise its allegedly exclusive rights to reproduce and sell copyrighted works going all the way back to UMB's installment as co-trustee of the Benton estate in 1979.

32.     These brand new copyright-related allegations were based on the incorrect assumption that the Benton Trusts actually owned the copyrights in all of THB's artworks.

33.     UMB immediately responded through amended interrogatory responses, indicating that the Benton Trusts did not own the copyrights in all of THB's artworks while UMB was Trustee, because many of the works had passed into the public domain. UMB further indicated that THB had assigned other copyrights to non-UMB third parties prior to his death, and that the Benton Trusts did not have renewal rights in other expired copyrights because those rights had passed to THB's living children by statute.

34.     Each of these issues raised by UMB,[1] however, requires interpretation and

---

[1] Specifically, (1) whether certain THB copyrights had passed into the public domain, for instance for failure to observe statutory copyright notice formalities during publication or for failure of parties other than the Benton Trusts to renew copyrights; (2) whether renewal rights in certain copyrights passed by statute to THB's living children rather than to the Benton Trusts; (3) whether THB assigned copyrights to third parties during his lifetime such that the Benton Trusts

7

application of federal copyright law, specifically the various iterations of the U.S. Copyright Act.

35.     Defendants' disclosure also clarified for the first time that Defendants were seeking damages based on allegations that UMB, as Trustee of the Benton Trusts, failed to license copyrighted THB artworks and failed to exercise its allegedly exclusive rights to reproduce and sell copyrighted works prior to December 14, 2016, which is more than three years before Defendants filed the State Court Action, which UMB contends is barred by the Copyright Act, 17 U.S.C. § 507(b).

36.     As these issues raised by UMB require interpretation and application of federal copyright law, the new copyright-related allegations made by Defendants (as plaintiffs in the State Court Action)—that UMB, as trustee of the Benton Trusts, supposedly failed to license copyrighted THB artworks and to exercise the Trusts' allegedly exclusive rights to reproduce and sell copyrighted works—as well as the claims supposedly supported by these allegations, arise under the U.S. Copyright Act.

37.     Because Defendants' disclosure finally revealed the need for application and interpretation of the U.S. Copyright Act and spotlighted the importance of copyright issues in the case, and because the related claims now arise under the U.S. Copyright Act, UMB filed a notice of removal to this Court on June 19, 2021.

38.     Defendants, as plaintiffs in the removed case, filed a motion to remand that case on June 26, 2021. Oral argument on that motion was held on August 19, 2021.

39.     On September 20, 2021, the federal district court issued its Order granting

---

never acquired those copyrights; (4) whether certain copyrights belonged to third parties by statute under the work-for-hire doctrine and therefore never passed to the Benton Trusts; (5) whether the Copyright Act's three-year lookback provision on damages bars claims for damages accruing before December 14, 2016; and (6) whether the Benton Trusts owned a valid copyright in any THB artwork while UMB served as Trustee.

8

Defendants' motion to remand the action to state court.

40.     UMB, therefore, files this declaratory judgment action for purposes of resolving outstanding disputes with Defendants regarding copyright notice, ownership, renewal rights, and the application of the Copyright Act's three-year lookback on damages, all of which are squarely rooted in federal copyright law and require interpretation and application of the U.S. Copyright Act, which falls under the exclusive jurisdiction of federal courts.

### III.  Facts Concerning THB Works That Passed Into the Public Domain Prior to UMB Becoming Trustee Due to Failure by THB and Third Party Copyright Assignees to Comply with Copyright Notice Requirements

41.     Many THB artworks[2] passed into the public domain prior to UMB being installed as co-trustee of the Benton Trusts due to the failure of THB or his copyright assignees to comply with statutory copyright notice requirements when those works were published.

42.     Associated American Artists (AAA) was an organization formed in 1934 by publicist Reeves Lewenthal with the purpose of selling art to the American public at affordable prices, mainly through mail-order catalogs. AAA sold signed lithographs of artists' works directly to the public, typically in editions of 250 lithographs at a time.[3]

43.     Thomas Hart Benton sold lithographs of at least 62 of his different artworks through AAA between 1936 and 1948 and again between 1969 and 1974. A listing of the titles of those artworks and the date of publication for each (the date the lithographs were first made available for sale) is as follows:[4]

---

[2] The term "artworks" as used herein refers to paintings, drawings, lithographs, prints, sculptures, photographs, and other works of visual art and any copies thereof, while excluding books and musical compositions.

[3] https://sites.utexas.edu/ransomcentermagazine/2020/04/07/for-the-walls-of-america/ (last visited September 8, 2021).

[4] Sourced from "Art for Every Home: An Illustrated Index of Associated American Artists

Case 4:21-cv-00710-SRB   Document 1   Filed 10/01/21   Page 9 of 36

| Name | Publication Date |
| --- | --- |
| Aaron | 1941 |
| After the Blow | 1947 |
| Arkansas Evening | 1941 |
| Back from the Fields | 1945 |
| Benton Farm | 1972 |
| The Boy | 1948 |
| The Corral | 1948 |
| County Politics | 1973 |
| Cradling Wheat | 1939 |
| Discussion | 1969 |
| Down the River | 1940 |
| A Drink of Water | 1937 |
| Edge of Town | 1938 |
| The Farmer's Daughter | 1944 |
| The Fence Mender (Fender Mender) | 1940 |
| Fire in the Barnyard | 1944 |
| Flood | 1937 |
| Forward Pass | 1972 |
| Frankie and Johnny | 1936 |

---

Prints, Ceramics, and Textile Designs," Gail Windisch et al., Kansas State University, 2016 (hereafter "the KSU Index"), available for download at https://krex.k-state.edu/dspace/handle/2097/19686 (last visited September 8, 2021); and The Lithographs of Thomas Hart Benton, 3d ed., Creekmore Fath editor, 2001.

| | |
|---|---|
| Frisky Day | 1939 |
| Gateside Conversation | 1946 |
| Goin' Home | 1937 |
| Haystack | 1940 |
| Homeward Bound | 1942 |
| Homestead (In the Ozarks) | 1938 |
| Huck Finn | 1936 |
| I Got a Gal on Sourwood Mountain | 1938 |
| Instruction | 1942 |
| Investigation | 1939 |
| Island Hay | 1946 |
| Jesse James | 1936 |
| Jessie and Jake | 1942 |
| Letter from Overseas | 1943 |
| Loading Corn | 1945 |
| Lonesome Road | 1938 |
| Making Camp | 1972 |
| The Meeting | 1942 |
| Missouri Farmyard | 1936 |
| Morning Train | 1943 |
| Mr. President | 1971 |
| The Music Lesson | 1944 |
| Night Firing | 1943 |

| | |
|---|---|
| Old Man Reading | 1941 |
| Planting | 1940 |
| Plowing It Under | 1934 |
| Prodigal Son | 1942 |
| Rainy Day | 1938 |
| Repairing the Sloop | 1973 |
| Self-Portrait (I) | 1972 |
| Self-Portrait (II) | 1973 |
| Shallow Creek | 1940 |
| Slow Train through Arkansas | 1942 |
| Sorghum Mill | 1969 |
| Spring Tryout | 1944 |
| Sunday Morning | 1939 |
| Sunset | 1941 |
| Threshing | 1941 |
| White Calf | 1945 |
| The Woodpile | 1939 |
| Wreck of *Old 97* | 1944 |
| Wyoming Autumn | 1974 |
| Youth Music | 1974 |

44.     On information and belief, most if not all of the THB lithographs sold by AAA lacked proper statutory notice of copyright upon publication, thereby dedicating the corresponding works to the public domain.

12

45.     As one example, an item purporting to be one of the 250 signed AAA lithographs of the THB work "Missouri Farmyard" was available for sale on the auction website eBay as of September 9, 2021. (A capture of the eBay listing as it appeared on that day is included as Exhibit B).

46.     According to the KSU Index, the original set of 250 AAA lithographs of "Missouri Farmyard" (also known as "Kansas Farmyard") was published in 1936.

47.     The eBay listing for "Missouri Farmyard" includes three detailed photographic images of the lithograph up for auction: two images of the front of the lithograph and one of the back.

48.     None of these three images shows any indication of copyright whatsoever, such as the word "Copyright," the symbol ©, or the date of publication.

49.     On information and belief, other "Missouri Farmyard" lithographs in AAA's set of 250 similarly lacked indication of copyright.

50.     As another example, an item purporting to be one of the 250 signed AAA lithographs of the THB work "Slow Train Through Arkansas" was listed as being recently for sale through the art marketplace website Lofty as of September 10, 2021. (A capture of the Lofty listing as it appeared on that day is included as Exhibit C).

51.     According to the KSU Index, the set of 250 AAA lithographs of "Slow Train Through Arkansas" was published in 1942.

52.     The Lofty listing for "Slow Train Through Arkansas" includes four detailed photographic images of the lithograph up for sale: three images of the front of the lithograph and one of the back.

53.     None of these four images shows any indication of copyright whatsoever, such as

13

the word "Copyright," the symbol ©, or the date of publication.

54. On information and belief, other "Slow Train Through Arkansas" lithographs in AAA's set of 250 similarly lacked indication of copyright.

55. As yet another example, an item purporting to be one of the 250 signed AAA lithographs of the THB work "Discussion" was listed as being recently for sale through the art marketplace website Lofty as of September 10, 2021. (A capture of the Lofty listing as it appeared on that day is included as Exhibit D).

56. According to the KSU Index, the set of 250 AAA lithographs of "Discussion" was published in 1969.

57. The Lofty listing for "Discussion" includes four detailed photographic images of the lithograph up for sale: three images of the front of the lithograph and one of the back.

58. None of these four images shows any indication of copyright whatsoever, such as the word "Copyright," the symbol ©, or the date of publication.

59. On information and belief, other "Discussion" lithographs in AAA's set of 250 similarly lacked indication of copyright.

60. As the lithographs described *supra* in ¶¶ 45-59, like all of the THB lithographs sold by AAA between 1936 and 1974, were published prior to 1978, any copyrights in these works would be governed by the Copyright Act of 1909 ("the 1909 Act").

61. Under § 18 of the 1909 Act, a valid notice of copyright comprises at least the word "Copyright" or symbol © and the name of the copyright holder affixed to any published copy of a work of art.

62. Under § 9 of the 1909 Act, any failure to affix a valid copyright notice to copies of a work of art resulted in forfeiture of copyright in that work and irretrievable dedication into the

14

public domain immediately upon publication.

63.    Because the lithographs described *supra* in ¶¶ 45-59 were published without a valid copyright notice, the lithographs themselves and any works on which they were based passed irretrievably into the public domain upon publication of the lithographs.

64.    On information and belief, many other THB lithographs sold through AAA contained similar deficiencies in copyright notice, and those lithographs and any underlying works on which they were based, therefore, also passed into the public domain prior to THB's death in 1975.

65.    On further information and belief, these sales of THB lithographs through AAA having no notice of copyright establish that it was not THB's practice to include notice of copyright in lithographs that he sold, such that many additional works outside of the AAA distribution channel were likely published without proper notice of copyright and, therefore, passed irretrievably into the public domain upon their publication.

66.    Because these works passed into the public domain prior to UMB being installed as co-trustee of the Benton estate, UMB, as Trustee, never had rights to license or enforce copyrights in these works and never had exclusive rights to produce and sell copies of these works.

IV.    **Facts Concerning THB Works That Passed Into the Public Domain Prior to UMB Becoming Trustee Due to Failure of THB to Renew Any Copyrights He Held in Works Published Before 1947**

67.    Many THB artworks passed into the public domain prior to UMB being installed as co-trustee of the Benton estate due to the failure of THB to renew expiring copyrights he may have held in his own works originally published prior to 1947.

68.    There are no records of THB renewing any copyrights he may have held in his own artworks published prior to 1947.

15

69.     Copyright renewals for any artworks first published prior to 1950 would be governed by the 1909 Act. Section 23 of the 1909 Act provided for a first copyright term of 28 years following initial publication of a work. Under the 1909 Act, each copyright term could then be renewed for a second 28-year term following expiration of the first term. If the copyright was not renewed following expiration of the first 28-year term, copyright protection terminated and the work passed irretrievably into the public domain.

70.     THB died on January 19, 1975.

71.     Therefore, the copyright in any THB works first published prior to 1947, and that complied with statutory copyright requirements, would have come up for renewal during THB's lifetime.

72.     THB, and not UMB or any trust administered by UMB, would have had sole renewal rights in those works to the extent THB held copyrights in them to begin with.

73.     THB published hundreds of artworks prior to 1947.

74.     For example, 47 of the 62 works for which lithographs were sold through AAA (as listed in the Table following ¶ 43) were published prior to 1947.

75.     Under the 1909 Act (and revisions thereto), the offer for sale or actual sale of a work constituted publication and triggered compliance obligations with statutory copyright requirements to retain copyright in the published work.

76.     Many if not most of the THB artworks published prior to 1947 were not published in compliance with statutory copyright requirements, as discussed at ¶¶ 45-65 above, and, therefore, passed into the public domain at the time of publication.

77.     Even had statutory copyright requirements been followed, however, the absence of renewal records for any THB artworks that were published prior to 1947 and in which THB may

16

have held copyright demonstrates that THB did not renew his copyright in any other works published prior to 1947.

78.     Hundreds of THB artworks published prior to 1947 irretrievably passed into the public domain owing to THB's failure to renew any copyright he held in those works after their initial 28-year copyright term expired.

79.     These works having passed into the public domain prior to UMB being installed as co-trustee of the Benton estate, UMB, as Trustee, never had rights to license or enforce copyrights in these works and never had exclusive rights to produce and sell copies of these works.

**V.   Facts Concerning Works Published Between 1947 and 1963, for which Non-Trust Third Parties Received Renewal Rights, that Were Dedicated to the Public by a Failure to Renew**

80.     The renewal right for many THB artworks passed by statute to THB's daughter Defendant Jessie Benton and THB's son T.P. Benton, during his lifetime, regardless of any contrary intent or attempts by THB.

81.     Neither Jessie Benton nor T.P. Benton, during his lifetime, ever exercised their renewal rights to renew any THB copyright, such that many, if not all, of the THB artworks published between 1947 and 1963 were irretrievably dedicated to the public.

82.     THB published hundreds of additional artworks between 1947 and 1963.

83.     For example, multiple works for which lithographs were sold through AAA (as listed in the Table following ¶ 43) were published between 1947 and 1963.

84.     The initial copyright term for these works would have expired 28 years after the date of their initial publication.

85.     Because the first copyright term for THB artworks published in 1947 and later would have expired after THB's death on January 19, 1975, renewal rights in these works would

17

not have vested in THB even if he owned the copyrights in them up until the time of his death.

86.     Rather, under § 24 of the 1909 Act, and its replacement 17 U.S.C. § 304 of the Copyright Act of 1976 ("1976 Act"), the renewal rights in any copyright held by a deceased author or artist up until the time of his or her death would automatically and unavoidably vest in the widow, widower, or children of the author, if the author is not living; in the author's executors, if the author, widow, widower, or children are not living; or in the author's next of kin, if the author has no will.

87.     Therefore, even assuming all copyright formalities were met so that a copyright existed in a published work and was owned by THB, the renewal rights in any such works published between 1947 and THB's death would have automatically and unavoidably vested first in THB's widow Rita Benton during her lifetime, and then in THB's living children, Defendant Jessie Benton and T.P. Benton during his own lifetime.  This would have occurred automatically by federal statute, even if THB attempted to convey them elsewhere.

88.     More particularly, any THB works published between 1947 and 1963 in which THB held a valid copyright at the time of his death would have had their first 28-year copyright term expire prior to 1992, and renewal rights in those works would have automatically and unavoidably vested first in THB's widow Rita Benton, and then, following her death in April 1975, in THB's then-living children, Defendant Jessie Benton and T.P. Benton, immediately prior to expiration.

89.     The initial copyright term in works published between 1947 and 1963 would have expired between 1975 and 1992.

90.     There were no renewals of copyrights in THB works between 1975 and 1992 in the name of Rita Benton, Jessie Benton, or T.P. Benton.

18

91.     Therefore, none of Rita Benton during her lifetime, Jessie Benton, or T.P. Benton during his lifetime, renewed the expiring copyrights of these works published between 1947 and 1963, to the extent any valid, renewable copyright existed and was held by THB at the time of his death.

92.     These works, therefore, passed irretrievably into the public domain upon expiration of their copyrights prior to 1992.

93.     The works having passed into the public domain prior to 1992, UMB, as Trustee, did not have rights to license or enforce copyrights in these works, and did not have exclusive rights to produce and sell copies of these works, following the expiration of their first 28-year copyright term, again assuming any valid, renewable copyright existed.

## VI.   Facts Concerning Vesting of Renewal Rights for THB Works Published After 1963 in Non-Trust Third Parties

94.     On information and belief, UMB, as Trustee, never had rights to renew any copyright that may have attached to works published between 1964 and THB's death in 1975 and which have had any initial copyright term expire.

95.     In 1992, amendments to the U.S. Copyright Act provided that copyrights would automatically renew after expiration of their first 28-year term for works expiring after enactment of the amendments. These amendments, however, did not change the statutory hierarchy of renewal rights described *supra* at ¶ 86.

96.     In view of the 1992 amendments, any THB works published between 1964 and THB's death in 1975, and in which THB held a valid copyright at the time of his death, would have had any first 28-year term expire after enactment of the 1992 amendments described *supra*. Renewal rights in those works would have automatically and unavoidably vested in THB's then-living children, Defendant Jessie Benton and T.P. Benton, immediately prior to expiration.

19

97. THB published dozens of artworks between 1964 and the time of his death in 1975.

98. For example, multiple works for which lithographs were sold through AAA (as listed in the Table following ¶ 43) were published after 1964.

99. Because renewal rights automatically and unavoidably vested in Jessie Benton and T.P. Benton during his lifetime immediately prior to expiration of the first 28-year copyright term, UMB, as Trustee, did not have rights to license or enforce copyright in these works and did not have exclusive rights to reproduce and sell copies of these works following the expiration of their first 28-year copyright term, again assuming any valid, renewable copyright existed and was held by THB at the time of his death.

## VII. Facts Concerning THB Works in Which UMB Never Had Any Rights as Trustee Because THB Assigned His Copyright to Third Parties

100. Prior to his death, THB assigned the copyright in many of his artworks to third parties, meaning that UMB, as Trustee, never had rights to license or sell any copyright in these works, or to reproduce and sell copies of these works.

101. For instance, the table below summarizes all THB artworks believed to have been registered in the U.S. Copyright Office between 1946 and 1954, including the name of the work, the name in which the copyright was registered, and the copyright date.

| Name | Registrant | Copyright Date |
| --- | --- | --- |
| Achelous and Hercules | Harzfeld's, Inc. | May 6, 1947 |
| After Many Springs | Associated American Artists (AAA) | February 12, 1946 |
| Back from the Fields | AAA | February 12, 1946 |
| Boom Town | Encyclopedia Britannica | January 12, 1946 |
| Corn and Winter Wheat | AAA | February 12, 1946 |

20

| | | |
|---|---|---|
| Cotton Pickers | AAA | February 12, 1946 |
| Custer's Last Stand | Richard Russell | October 12, 1948 |
| Down on the Farm | National City Bank of New York | December 25, 1947 |
| Electric Power | Kansas City Power & Light | March 19, 1953 |
| Gateside Conversation | AAA | February 12, 1946 |
| The Kentuckian (The Hunter) | United Artists Corp. | December 20, 1954 |
| Louisiana Rice Fields | Artext Prints | February 10, 1948 |
| The Music Lesson | Thomas Hart Benton | April 1, 1946 |
| Plantation Road | AAA | February 12, 1946 |
| Rice Threshing | AAA | February 12, 1946 |
| Roadside Bin | AAA | February 12, 1946 |
| Spring on the Missouri | AAA | February 12, 1946 |
| Spring Tryout | New York Graphic Society | April 1, 1949 |
| Sugar Cane | AAA | February 12, 1946 |
| Swing Your Partner | AAA | February 12, 1946 |
| Tulips in a Blue Vase | AAA | February 12, 1946 |
| Threshing Wheat | New York Graphic Society | August 26, 1954 |
| The Water Bucket | AAA | February 12, 1946 |

102.    According to the records of the U.S. Copyright Office, only one of the 23 artworks having copyrights registered with the U.S. Copyright Office during this time period ("The Music Lesson") lists THB as the copyright holder.

103.    According to the records of the U.S. Copyright Office, the copyrights in 22 of the 23 artworks having copyrights registered with the U.S. Copyright Office during this time period were or are held by third parties.

21

104.    Under the applicable copyright statutes, § 55 of the 1909 Act and its replacement 17 U.S.C. § 410 in later Acts, a "certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."

105.    Most or all of the copyrights in the works listed in the table at ¶ 101 above were registered within five years of their first publication, and all but one work would have listed a non-THB third party as the copyright holder.

106.    In view of these statutes, the listing of copyright holders other than THB in the records of the U.S. Copyright Office constitutes prima facie evidence that those other registrants owned any copyrights in these works, and therefore that THB did not own the copyrights in these works.

107.    Because THB did not own copyrights in these works, the copyrights in these works did not pass to the Benton Trusts following THB's death.

108.    Because these copyrights did not pass to the Benton Trusts following THB's death, the Benton Trusts never owned these copyrights and, therefore, UMB, as Trustee, never had rights to license or enforce any copyrights in these works, or to reproduce and sell copies of these works.

## VIII.  Facts Concerning THB Works in Which UMB Never Had Any Rights Because They Were Works for Hire in Which Non-UMB, Non-Trust Third Parties Held the Copyrights

109.    THB was hired at various times during his life by third parties to create works on commission.

110.    Those works satisfied the requirements of the "work-for-hire" doctrine, meaning that the third parties who commissioned those works or otherwise hired THB to create them—rather than THB himself—held the copyrights and all associated rights in those works.

111.    As one example, the State of Indiana in 1932 commissioned THB to create a set of

22

murals depicting aspects of Indiana history. The State agreed to pay THB $10,000 for the murals, and it provided him with materials necessary to create the murals, including approximately 10,000 eggs for his egg tempera paints. The completed murals, collectively known as "A Social History of the State of Indiana," were first displayed at the Chicago World's Fair in 1933 and have been on display at the main campus of Indiana University in Bloomington, Indiana since 1939.

112.     As another example, the State of Missouri in 1935 commissioned THB to create a set of murals for display in the Missouri State Capitol building, depicting aspects of Missouri history and culture. The state legislature appropriated $16,000 to THB for the murals. THB completed the murals, collectively titled "A Social History of Missouri," in 1937. The murals are still displayed in the Missouri Capitol building as of the date of this Complaint.

113.     As another example, the Harry S. Truman Library in 1958 commissioned THB to create a mural for display in the library itself, depicting the people of Independence, Missouri between 1817 and 1947. The Library agreed to pay THB $60,000 to create the mural and, according to a press release from the Harry S. Truman Library, Inc., former president Truman was "to have final approval of the subject matter and design" of the mural. THB completed the mural, titled "Independence and the Opening of the West," in 1961. The mural is still displayed on one wall of the Harry S. Truman Library & Museum in Independence.

114.     Because "A Social History of the State of Indiana," "A Social History of Missouri," and "Independence and the Opening of the West" were created before enactment of the 1976 Copyright Act, the provisions of the 1909 Act concerning the "work-for-hire" doctrine apply to those works.

115.     Under § 62 of the 1909 Act, the word "author," as it pertains to the holder of copyright and all associated rights in eligible creative works, "shall include an employer in the

case of works made for hire."

116.    The work-for-hire doctrine under the 1909 Act has since been extended by courts to commissioned works created by independent contractors, granting copyrights to the employers or other commissioning parties rather than to the independent contractors who actually create the works, when the work was made at the commissioning parties' instance and expense.

117.    "A Social History of the State of Indiana" was a work for hire, including because the State of Indiana commissioned THB to create the work as an employee or independent contractor and provided him with materials for doing so, and THB therefore never owned any copyright in "A Social History of the State of Indiana."

118.    "A Social History of Missouri" was a work for hire, including because the State of Missouri commissioned THB to create the work as an employee or independent contractor, and THB therefore never owned any copyright in "A Social History of Missouri."

119.    "Independence and the Opening of the West" was a work for hire, including because the Harry S. Truman Library commissioned THB to create the work as an employee or independent contractor and former president Truman reserved rights of final approval over the mural's subject matter and design, and THB therefore never owned any copyright in "Independence and the Opening of the West."

120.    THB was commissioned as an employee or independent contractor to create various other works during his lifetime, all of which would have been completed prior to his death in 1975 and, therefore, governed by the work-for-hire provisions of the 1909 Act, such that THB never owned any copyright in these other works.

121.    Because THB did not own copyrights in these works, the copyrights in these works did not pass to the Benton Trusts following THB's death.

122.    Because these copyrights did not pass to the Benton Trusts following THB's death, the Benton Trusts never owned these copyrights and, therefore, UMB, as Trustee, never had rights to license or enforce any copyrights in these works or to reproduce and sell copies of these works.

### IX.    Facts Concerning the Operation of the Three-Year Lookback Provision for Damages Claims Arising Under the Copyright Act

123.    The Copyright Act, at 17 U.S.C. § 507(b), states that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."

124.    In the State Court Action, Defendants assert claims and seek damages for alleged failures by UMB as Trustee of the Benton Trusts, to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, that occurred prior to December 14, 2016, which is three years prior to the date Defendants filed their state court petition on December 14, 2019.

125.    As discussed *supra* at ¶¶ 34-40, any portions of Defendants' claims in the State Court Action that are based on UMB's alleged failure as Trustee to license copyrighted THB artworks, and to exercise its allegedly exclusive rights to reproduce and sell copyrighted works, arise under the U.S. Copyright Act.

126.    The United States Supreme Court explained in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, that "Congress . . . prescribed a three-year look-back limitations period for all civil claims arising under the Copyright Act." 572 U.S. 663, 670 (2014) (referring specifically to 17 U.S.C. § 507(b)).

127.    As parts of Defendants' claims in the State Court Action "aris[e] under the Copyright Act," those parts are subject to the three-year look-back limitations period of 17 U.S.C. § 507(b) such that Defendants cannot recover damages based on any alleged failures by UMB to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, that

25

occurred prior to December 14, 2016, which is three years prior to the date Defendants filed their state court petition.

## X.  Facts Concerning Defendants' Inability to Prove that the Benton Trusts Owned a Valid Copyright in any THB Artworks During the Period When UMB Served as Co-Trustee or Trustee

128.    In the State Court Action, Defendants in this case bear the burden of proving they are entitled to damages.

129.    Defendants can, therefore, only obtain damages in the State Court Action for Defendants' copyright-related allegations to the extent that Defendants prove that the Benton Trusts actually owned copyrights in THB artworks during the period where UMB served as a Trustee of the Benton Trusts.

130.    As demonstrated at least by ¶¶ 41-122 above, under a proper interpretation of the Copyright Act, Defendants will not be able to meet that burden of proof for hundreds of THB artworks.

131.    These same allegations establish a practice by THB of not taking measures to create and preserve valid copyrights owned by THB in THB artworks during his lifetime, and a practice by THB's heirs of not taking measures to preserve any valid copyrights in THB's artworks that may have existed at the time of THB's death.

132.    These same allegations show that, after discovery in this case, Defendants will be unable to prove that the Benton Trusts owned any valid copyrights in THB artworks during the period that UMB acted as Trustee for the Benton Trusts, that UMB, as Trustee, never had rights to license or enforce any copyrights in these works or to exclusively reproduce and sell copies of these works, and that Defendants therefore cannot recover damages based on any alleged failures by UMB to license, or to exercise any exclusive rights in reproduction and sales of copyrighted

26

works.  As such, UMB is entitled to declaratory judgment that the Benton Trusts never owned a valid and enforceable copyright in any THB artworks during the time that UMB served as Trustee or co-Trustee of the Benton Trusts.

**COUNT I: DECLARATORY JUDGMENT-**
**CERTAIN THB WORKS ARE IN THE PUBLIC DOMAIN**

133.    UMB hereby repeats, re-alleges, and incorporates by reference ¶¶ 1-132 above.

134.    UMB seeks a declaration from the Court that certain THB artworks, including those addressed at ¶¶ 45-59 above and others to be determined through discovery, passed into the public domain—prior to UMB being installed as co-trustee for the Benton estate—for failure of THB or his third-party, non-UMB copyright assignees to comply with statutory copyright formalities concerning notice.

135.    UMB seeks a declaration from the Court that any THB artworks that were published prior to 1947 and in which THB held a valid copyright passed into the public domain prior to THB's death in 1975 due to THB's failure to renew any copyright in those works.

136.    UMB seeks a declaration from the Court that any THB artworks that were published between 1947 and 1963 and in which THB held a valid copyright at the time of his death passed into the public domain upon expiration of any initial copyright term because renewal rights in those works would have vested first in THB's widow Rita Benton during her lifetime and then, following her death in April 1975, in THB's living children Defendant Jessie Benton and T.P. Benton during his lifetime, and none of Rita Benton, Jessie Benton, or T.P. Benton renewed any copyrights in such works.

137.    There is an actual controversy concerning whether certain THB works passed into the public domain for failure of THB or his third-party, non-UMB copyright assignees to comply with copyright notice requirements when the works were published.

138.    There is an actual controversy concerning whether certain THB works passed into the public domain for failure of THB to renew any copyrights he may have held.

139.    There is an actual controversy concerning whether certain THB works passed into the public domain for failure of Rita Benton during her lifetime, Defendant Jessie Benton, and T.P. Benton, during his lifetime, to renew copyrights in certain THB works when renewal rights vested in them.

140.    For each THB work falling into one of these three categories, and thus for which UMB seeks declaratory judgment that it is in the public domain, Defendants seek monetary damages from UMB in state court for UMB's alleged failure, as Trustee, to exercise certain rights as to the work that are exclusively vested in the owner of an existing copyright, such as licensing to others the right to reproduce the work, or filing suit (or threatening to do so) to stop others from reproducing the work.

141.    A declaratory judgment by this Court will settle and determine the dispute over whether certain THB artworks passed into the public domain through no fault of UMB, thereby making it impossible for UMB, as Trustee, to license or enforce any copyrights in these works, and extinguishing any exclusive right UMB had as Trustee to reproduce and sell copies of these works, and will therefore determine whether UMB, as former Trustee, could possibly owe Defendants the monetary damages sought by Defendants as to these works.

142.    UMB seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 stating that certain THB works are in the public domain, and were in the public domain during some or all of the time that UMB served as Trustee for the Benton Trusts.

<u>COUNT II: DECLARATORY JUDGMENT-</u>
<u>RENEWAL RIGHTS IN COPYRIGHT</u>

143.    UMB hereby repeats, re-alleges, and incorporates by reference ¶¶ 1-142 above.

28

144. UMB seeks a declaration from the Court that, as Trustee, UMB never had renewal rights in any expired copyrights for THB artworks published between 1963 and THB's death on January 19, 1975 and in which THB held the copyright at the time of his death, because any renewal rights in such works would have vested in THB's living children Defendant Jessie Benton and T.P. Benton during his lifetime.

145. There is an actual controversy concerning whether UMB, as Trustee, could have renewed any copyright that may have existed for THB artworks published between 1963 and THB's death on January 19, 1975 and in which THB held the copyright at the time of his death, for purposes of licensing or enforcement of copyrights, or for retaining exclusive rights in reproducing and selling copies.

146. For each THB work falling into this category, and thus for which UMB seeks declaratory judgment that the renewal rights did not vest in UMB, Defendants seek monetary damages from UMB in state court for UMB's alleged failure, as Trustee, to exercise certain rights as to the work that are exclusively vested in the owner of an existing copyright, such as licensing to others the right to reproduce the work, or filing suit (or threatening to do so) to stop others from reproducing the work.

147. A declaratory judgment by this Court will settle and determine the dispute over who had or still has copyright renewal rights in those works, and will therefore determine whether UMB, as former Trustee, could possibly owe Defendants the monetary damages sought by Defendants as to these works.

148. UMB seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 stating that, as Trustee, it never had copyright renewal rights in THB artworks published between 1963 and THB's death on January 19, 1975.

## COUNT III: DECLARATORY JUDGMENT-
## DIVESTMENT OF COPYRIGHT OWNERSHIP THROUGH ASSIGNMENT

149.    UMB hereby repeats, re-alleges, and incorporates by reference ¶¶ 1-148 above.

150.    UMB seeks a declaration from the Court that the Benton Trusts never owned copyrights in certain THB artworks, including those addressed at ¶¶ 101-108 above and others to be determined through discovery, because THB assigned the copyrights in these works to non-UMB third parties prior to his death.

151.    There is an actual controversy concerning whether copyrights in certain THB works were assigned to non-UMB third parties prior to THB's death in 1975, and therefore never passed to the Benton Trusts such that UMB, as Trustee, could license or enforce these copyrights or reproduce and sell copies of these works.

152.    For each THB work falling into this category, and thus for which UMB seeks declaratory judgment that THB conveyed the copyright to a non-UMB third party prior to his death in 1975, Defendants seek monetary damages from UMB in state court for UMB's alleged failure, as Trustee, to exercise certain rights as to the work that are exclusively vested in the owner of an existing copyright, such as licensing to others the right to reproduce the work, or filing suit (or threatening to do so) to stop others from reproducing the work.

153.    A declaratory judgment by this Court will settle and determine the dispute over whether the Benton Trusts ever owned the copyrights in these works, and will therefore determine whether UMB, as former Trustee, could possibly owe Defendants the monetary damages sought by Defendants as to these works.

154.    UMB seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 stating that the Benton Trusts never owned copyrights in certain THB works because THB assigned his copyrights in those works to third parties prior to his death.

30

## COUNT IV: DECLARATORY JUDGMENT-
## OWNERSHIP OF COPYRIGHT IN VIEW OF
## WORK-FOR-HIRE DOCTRINE

155. UMB hereby repeats, re-alleges, and incorporates by reference ¶¶ 1-154 above.

156. UMB seeks a declaration from the Court that the Benton Trusts never owned copyrights in certain THB artworks, including those addressed at ¶¶ 109-122 above and others to be determined through discovery, because those works were commissioned by third parties and it was those third parties, rather than THB, who owned the copyrights under the work-for-hire doctrine.

157. There is an actual controversy concerning whether copyrights in certain THB works belonged to third parties under the work-for-hire doctrine, and therefore never passed to the Benton Trusts such that UMB, as Trustee, could license or enforce these copyrights or reproduce and sell copies of these works.

158. For each THB work falling into this category, and thus for which UMB seeks declaratory judgment that copyright in the work belonged to a non-Trust, non-UMB third party under the work-for-hire doctrine, Defendants seek monetary damages from UMB in state court for UMB's alleged failure, as Trustee, to exercise certain rights as to the work that are exclusively vested in the owner of any existing copyright, such as licensing to others the right to reproduce the work, or filing suit (or threatening to do so) to stop others from reproducing the work.

159. A declaratory judgment by this Court will settle and determine the dispute over whether the Benton Trusts ever owned the copyrights in these works, and will therefore determine whether UMB, as former Trustee, could possibly owe Defendants the monetary damages sought by Defendants as to these works.

160. UMB seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57

31

stating that the Benton Trusts never owned copyrights in certain THB works because any copyrights in the works were or are owned by non-Trust, non-UMB third parties under the work-for-hire doctrine.

## COUNT V: DECLARATORY JUDGMENT-
## BARRING PORTIONS OF DEFENDANTS' STATE COURT DAMAGES ASK DUE TO THE THREE-YEAR LOOKBACK PERIOD FOR DAMAGES FOR CLAIMS ARISING UNDER THE COPYRIGHT ACT

161.    UMB hereby repeats, re-alleges, and incorporates by reference ¶¶ 1-160 above.

162.    UMB seeks a declaration from the Court that any damages sought by Defendants as plaintiffs in the State Court Action that are based on Defendants' allegations that UMB, as Trustee, supposedly failed to license copyrighted THB artworks and to exercise its allegedly exclusive rights to reproduce and sell copyrighted works are subject to the three-year look-back period for damages prescribed by 17 U.S.C. § 507(b), which states that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."

163.    UMB further seeks a declaration from the Court that Defendants are therefore statutorily barred from recovering damages in the State Court Action based on any alleged failures to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, that occurred prior to December 14, 2016, which is three years prior to the date Defendants filed their state court petition.

164.    There is an actual controversy concerning whether Defendants are statutorily barred from recovering damages for their copyright-related claims based on any alleged failures by UMB, as Trustee, to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, occurring prior to December 14, 2016.

165.    A declaratory judgment by this Court will settle and determine the dispute over

32

whether, in view of 17 U.S.C. § 507(b), UMB could possibly owe Defendants the monetary damages sought by Defendants as to alleged failures by UMB, as former Trustee, to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, occurring prior to December 14, 2016.

166.     UMB seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 stating that Defendants are barred from recovering damages based on any alleged failures by UMB to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, occurring prior to December 14, 2016, because Defendants' claims based on these alleged failures arise under the U.S. Copyright Act, and 17 U.S.C. § 507(b) therefore applies.

**COUNT VI: DECLARATORY JUDGMENT-**
**THE BENTON TRUSTS DID NOT OWN ANY VALID AND ENFORCEABLE**
**COPYRIGHTS IN THB ARTWORKS WHILE UMB SERVED AS TRUSTEE OR CO-**
**TRUSTEE**

167.     UMB hereby repeats, re-alleges, and incorporates by reference ¶¶ 1-166 above.

168.     UMB seeks a declaration from the Court that the Benton Trusts did not own a valid and enforceable copyright in any THB artworks during the period where UMB acted as Trustee or co-Trustee for those Trusts.

169.     There is an actual controversy concerning whether the Benton Trusts owned valid and enforceable copyrights in THB artworks during this time, with Defendants in this case contending in state court that the Benton Trusts indeed owned valid and enforceable copyrights in virtually every artwork created by THB during his lifetime, and that they can recover damages for their copyright-related claims based on alleged failures by UMB, as Trustee, to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, and UMB contending that it cannot owe these damages because the Trusts administered by UMB did not own these copyrights and exclusive rights.

33

170. A declaratory judgment by this Court will settle and determine the dispute over whether, in view of Defendants' burden to prove ownership of valid copyrights by the Benton Trusts as part of its damages claims, UMB could possibly owe Defendants the monetary damages sought by Defendants as to alleged failures by UMB, as former Trustee, to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works.

171. UMB seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 stating that the Benton Trusts did not own any valid and enforceable copyright in any THB artworks while UMB served as Trustee or co-Trustee of those Trusts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff UMB prays that this Court enter judgment in its favor and against Defendants, including:

a) Entry of judgment that as of March 31, 2021, the last day on which UMB served as Trustee for the Benton Trusts, the Benton Trusts did not own and had never owned copyrights in certain THB works because those works had passed into the public domain prior to UMB becoming Trustee. This judgment applies to the works listed at paragraphs 45-59 of this Complaint, to any other works published prior to 1964 in which THB held copyright, and to other works to be uncovered during discovery and proven at trial.

b) Entry of judgment that as of March 31, 2021, the last day on which UMB served as Trustee for the Benton Trusts, the Benton Trusts did not have, and had never had, copyright renewal rights in any THB artworks published between 1964 and THB's death on January 19, 1975 in which THB held a valid copyright at the time of his death.

c) Entry of judgment that as of March 31, 2021, the last day on which UMB served as Trustee for the Benton Trusts, the Benton Trusts did not own and had never owned copyrights in certain THB works because THB assigned those copyrights to non-UMB third parties prior to his death. This judgment applies to the works described at paragraphs 101-103 of this Complaint, and to other works to be uncovered during discovery and proven at trial.

d) Entry of judgment that as of March 31, 2021, the last day on which UMB served as Trustee for the Benton Trusts, the Benton Trusts did not own and had never owned copyrights in certain THB works because they were hired works such that copyrights in them therefore belonged to non-Trust, non-UMB third parties under

34

the "works made for hire" doctrine. This judgment applies to the works listed at paragraphs 117-119 of this Complaint, and to other works to be uncovered during discovery and proven at trial.

e) Entry of judgment barring Defendants under 17 U.S.C. § 507(b) from recovering damages based on any alleged failures by UMB to license, or to exercise any exclusive rights in reproduction and sales of copyrighted works, occurring prior to December 14, 2016. This judgment specifically applies to the damages sought by Defendants in the case captioned *Jessie Benton, et al v. UMB Bank N.A.*, Case No.: 19P8-PR01534 (Circuit Court of Jackson County, Probate Division), and to any subsequent claim for damages in that case that arises under the Copyright Act.

f) Entry of judgment the Benton Trusts, while UMB served as Trustee, never owned valid and enforceable copyrights in any THB artwork.

g) An order awarding UMB its attorneys' fees and costs under 17 U.S.C. § 505.

h) Any and all other legal and equitable relief as may be available under law and which the Court deems just and proper.

Dated: October 1, 2021

Respectfully submitted by,

*/s/ Todd W. Ruskamp*
Todd W. Ruskamp, Mo Bar No. 38625
Email: truskamp@shb.com

B. Trent Webb, Mo Bar No. 40778
Email: bwebb@shb.com
Ryan J. Schletzbaum, Mo Bar No. 62631
Email: rschletzbaum@shb.com
Jordan Bergsten, Mo Bar No. 64268
Email: jbergsten@shb.com
Samuel J. LaRoque, Mo Bar No. 71052
Email: slaroque@shb.com

Patrick L. Kenney, Mo Bar No. 50205
Email: pkenney@shb.com
Russell J. Shankland, Mo Bar No. 63238
Email:rshankland@shb.com

SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108

35

Telephone:  816.474.6550
Facsimile:  816.421.5547

***Attorneys for Plaintiff UMB Bank, N.A.***